OPINION
{¶ 1} Defendant-appellant, Michael D. Phipps, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to a jury verdict, of murder in violation of R.C. 2903.02, with a firearm specification in violation of R.C.2941.145. Defendant assigns a single error:
The trial court erred when instructing the jury on the law of the statute of limitations and erred by not allowing the defense attorney to cross-examine the police detective on the issue of statute of limitations.
Because the trial court committed prejudicial error in restricting defendant's cross-examination, we reverse.
 {¶ 2} Defendant's conviction arises out of an incident during the early morning hours of July 24, 1993, when five men broke into the apartment of Kimberly Madison, looking for drugs and money to steal. Two of the five men ran upstairs; the other three men stayed downstairs and ransacked the lower level.
 {¶ 3} According to Madison, the two men, armed with handguns, kicked in the bedroom door and awakened her and her boyfriend, Chris Wilder, with demands for "money or drugs." Although Madison replied that they had neither money nor drugs, the men persisted with their requests. When Wilder stood up and responded that they did not have anything, "the guy told him to shut up * * * I'm not talking to you, and shot him." (Tr. 56, 73-74.) Wilder fell to the floor, and the two gunmen ran downstairs and out of the building.
 {¶ 4} Madison watched from her bathroom window as the gunmen drove off in a small, light blue, four-door vehicle. When she was sure she was safe, Madison ran across the street to call 911 from a payphone since her phone was not working. Madison was unable to identify the intruders, describing them only as "black males." (Tr. 77.)
 {¶ 5} Wilder was pronounced dead at the scene. The Franklin County Coroner's Office performed an autopsy and concluded Wilder "died of a gunshot wound on his right chest that resulted in perforation of his heart and stomach. He bled to death from those wounds." (Tr. 162.) The Columbus Police Crime Lab examined a bullet fragment recovered from the body during the autopsy and "determined [it] to be a 9mm, 38, or 380 caliber bullet fragment." (Exhibit J, J2.) In addition, there were several spent shell casings recovered from the scene: at least one from a .380 handgun, and one from a 9mm handgun. When the scene was dusted for potential fingerprints, many prints were recovered, but no matches or helpful leads were obtained in 1993.
 {¶ 6} In May 2000, prints previously lifted from boxes of Kellogg's Frosted Flakes and Keebler Sugar Cones in Madison's apartment were identified through the Automated Fingerprint Identification System as positive matches to Preston Bivens; no other positive fingerprint matches were made. Police, however, were led to another alleged participant, Shannon Williams, during their criminal investigation of Bivens. Through investigations of both Bivens and Williams, the police learned of defendant's alleged involvement.
 {¶ 7} At trial, Bivens testified about the events of July 24, 1993, and stated that he, Shawn Morton, Steve Loney, Shannon Williams ("Puff"), and defendant started out the evening by "just kicking, getting high and drunk." (Tr. 239.) After about an hour of that, the group drove around in "a big car like a 98 or something" and "stopped at a house * * * [where] Puff and Mike went to the doorway inside, we followed in after." (Tr. 240, 242.) Bivens stated the group's purpose for entering the house was to find valuables. To that end, Bivens "was looking around in the kitchen," while "Puff and Mike went upstairs." (Tr. 241.) As Bivens was going through the cupboards, he heard some yelling and two gunshots. In response, he ran: "I don't remember exactly where I ran. I ran out of the house away from there." (Tr. 242.) As Bivens remembered the incident, only Morton and defendant had guns. Bivens, however, admitted the first and only time he ever met defendant was the night of the break-in, and he did not remember everything about the evening because he was high, intoxicated, or both.
 {¶ 8} Williams' trial testimony differed from Bivens' testimony. According to Williams, the five men who participated in the break-in were himself, Shawn Morton, Allen Miller, defendant, and "some other dude. I don't really know him personally. * * * He's called Ernest." (Tr. 265.) On cross-examination, Williams admitted he did not know Steven Loney.
 {¶ 9} Williams further testified the group traveled to the scene in a smaller four-door vehicle, with defendant driving; the only two men with firearms were himself, who carried a "TEC-9mm," and defendant, who carried a ".380 or .38." (Tr. 277.) According to Williams, defendant "kicked the door in." After Williams fired his gun in the living room, he and defendant went upstairs, guns drawn, intending to rob "some dude named Opie." (Tr. 268, 270.) Williams indicated the bedroom door was already open, so he and defendant were able to walk straight through the door. Williams recalled "hollering" at the residents for money and drugs, and "all I remember was some lady, this girl, she was in the room, she jumped up, and the man got killed. He rolled over on the side of the bed and Mike Phipps shot down one time, you know what I'm saying, went on back downstairs to tell them, Shawn, let's go, Allen, let's go." (Tr. 271.)
 {¶ 10} Williams testified that after defendant shot the victim, all five men fled the scene together in the vehicle defendant had driven to the apartment. Williams agreed that if "Preston Bivens had testified that [Bivens] was one of [the five intruders], and that [Bivens] ended up running away from the scene and going elsewhere on his own, that would be a lie[.]" (Tr. 305, 309.) Williams further testified he had neither knowledge that anyone was going to die nor an intent to kill anyone the night of the break-in. He admitted, however, that "anything can happen when you go out there carrying a gun," and he stated he was not telling the jury he was not "prepared to shoot and kill someone that night[.]" (Tr. 318-319.)
 {¶ 11} On April 28, 2003, the jury returned a verdict finding defendant guilty of murder and the accompanying firearm specification, and the trial court sentenced defendant accordingly.
 {¶ 12} Defendant's single assignment of error contends the trial court committed prejudicial error in allowing Columbus Police Detective Edward Kallay, Jr., to testify erroneously about a matter of law and in following the testimony with an incorrect jury charge that bolstered the prosecution's witness. Defendant asserts the trial court further erred in curtailing his ability to cure the error on cross-examination.
 {¶ 13} The statutes of limitations governing criminal prosecutions "are designed to discourage dilatory law enforcement, to ensure that criminal prosecutions are based on reasonably fresh and more trustworthy evidence, and to avoid the unfairness of subjecting people to criminal liability indefinitely." State v. Price (Dec. 22, 1998), Franklin App. No. 98AP-428, citing State v. Hensley (1991), 59 Ohio St.3d 136,139. R.C. 2901.13(A) sets forth a six-year statute of limitations for all felonies other than murder and aggravated murder; the statute states that no period of limitation exists for violations of R.C. 2903.01 or 2903.02. See, also, Price, supra. Similarly, no statute of limitations period exists for complicity to murder.State v. Amin, Lucas App. No. L-03-1084, 2004-Ohio-886, at ¶ 12. See, also, R.C. 2923.03 (stating that if a person, acting with the culpability required for the commission of an offense, aids or abets another in committing the offense, that person is guilty of complicity in the commission of the offense and can also be prosecuted and punished as if he were the principal offender).
 {¶ 14} "A jury can infer an aider and abettor's purpose to kill where the facts show that the participants in a felony entered into a common design and either the aider or abettor knew that an inherently dangerous instrumentality was to be employed to accomplish the felony or the felony and the manner of its accomplishment would be reasonably likely to produce death." State v. Scott (1980), 61 Ohio St.2d 155, 165 (emphasis added); State v. Taylor (1993), 66 Ohio St.3d 295, 306; Statev. Johnson (2001), 93 Ohio St.3d 240, 245, quoting State v.Pruett (1971), 28 Ohio App.2d 29, 34 (noting that "[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed").
 {¶ 15} Within those parameters, a dispute arose during defendant's trial about the prosecution's failure to indict Shannon Williams for Wilder's murder. The state contended it could not have charged Williams with any crimes because the statute of limitations had run on any crime but murder or aggravated murder. According to the state, the evidence did not support an indictment against Williams as an aider or abettor to a murder offense, as the evidence did not demonstrate Williams had the requisite intent to kill. The state wanted its position presented, preferably through the testimony of Kallay, so the jury would understand why the state had not indicted Williams.
 {¶ 16} Defendant, by contrast, asserted the evidence supported Williams' potential guilt as an aider or abettor in Wilder's murder, including the necessary intent to kill. Defendant further contended that point was significant to his defense, as Williams' motive to fabricate a version of the murder was affected by whether Williams believed he yet could be charged with the murder of Wilder.
 {¶ 17} After extensive discussion with the trial court, the parties and the court agreed the state could inquire of Kallay about the reason no one but defendant was indicted for the crimes that occurred in 1993, the trial court then would instruct the jury about statutes of limitations, and defendant would be given the opportunity to cross-examine Kallay about his testimony.
 {¶ 18} Pursuant to the discussions with the court, the state inquired of Kallay about the reasons none of the other offenders were charged with crimes arising out of the 1993 murder, thereby eliciting testimony from Kallay concerning the criminal statutes of limitations. Kallay testified that "[b]asically, due to the time frame of the investigation, and the years that went by, the only actual crime that would have fit would be for the person that actually did the shooting. The other people that were there, even though there were complicitors, their charges wouldn't have fit as far as being within the Statute of Limitations." (Tr. 179-180.)
 {¶ 19} Immediately following Kallay's testimony, the trial court stated, "I believe what the detective has just said to us is * * * that the Statute of Limitations had lapsed on those offenses, all except a very few, and those very few, one of them would include a person who actually did the shooting. But it wouldn't have included anybody else who was present and during the commission of the crime that led up to the shooting. * * * The prosecutor has a statutory duty to file only charges that will present the prosecutor a reasonable opportunity of proving guilt in the case. So, the prosecutor doesn't have unlimited discretion as to the charges they may file. I believe that's all." (Tr. 181.)
 {¶ 20} In an ensuing discussion at the bench, defendant disputed the accuracy of the trial court's instruction, but the court refused further instruction at the time. Defendant, on cross-examination, attempted to question Kallay about the applicability of the murder statute of limitations, the purpose to kill being inferred from the use of a dangerous instrumentality. The state objected, and the trial court sustained the state's objection. Defendant contends the trial court erred in so doing.
 {¶ 21} Initially, contrary to Kallay's testimony and the trial court's instruction, the evidence supports Williams' potential guilt as an aider or abettor in the murder of Wilder. The five intruders entered Madison's apartment for the common purpose of committing a robbery, and in pursuit of that objective, two of the five men used firearms during the commission of the robbery. Indeed, according to Williams, Williams was with defendant in the bedroom where the murder occurred, entered the room believing he was robbing a drug dealer who likely would have a weapon, and was holding a gun pointed at Madison and Wilder. Pursuant to Scott, Williams validly could have been charged with aiding or abetting Wilder's murder. Statev. Conley (Apr. 9, 1998), Franklin App. No. 97APA05-701 (stating that "[t]he actions of the men show a common design to commit a crime and, even if appellant did not shoot and kill Martin, his actions and his presence, companionship and conduct before and after the murders were committed constitute aiding and abetting such that appellant could be convicted of Martin's murder");State v. McKibbon, Hamilton App. No. C-010145, 2002-Ohio-2041.
 {¶ 22} In addition, the trial court erred in allowing Kallay to testify to matters of law, and in particular, the statute of limitations. If the state believed the statute of limitations needed to be addressed for the sake of the jury's understanding the trial proceedings, it should have requested an instruction from the court. By allowing Kallay to testify to matters of law, the court opened cross-examination to further discussion of questions of law from a witness who could not properly testify to such matters.
 {¶ 23} Moreover, the trial court erred in limiting defendant's cross-examination of Kallay. Without question, the cross-examination inquiry highlighted the error of allowing Kallay to testify to legal matters. The state, however, opened the issue to defendant's cross-examination when it asked Kallay about the legal issue of the statute of limitations, and the trial court, under those circumstances, could not limit defendant's cross-examination of Kallay to the extent it did.
 {¶ 24} In criminal cases, errors are categorized as either constitutional or nonconstitutional errors. State v. Hurst
(Mar. 7, 2000), Franklin App. No. 98AP-1549; Davis, at 346. An error in a criminal trial is constitutional when it relates to an accused's federal or state constitutional rights; an error is nonconstitutional when federal or state constitutional rights are not implicated. Hurst; Davis, supra.
 {¶ 25} For a constitutional error to be harmless in a criminal case, the reviewing court must be able to determine the error was harmless beyond a reasonable doubt. Chapman v.California (1967), 386 U.S. 18, 24, 87 S.Ct. 824. Stated another way, the appellate court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. Davis, at 346. Thus, where evidence against the accused is "overwhelming," a reviewing court may conclude beyond a reasonable doubt that the denial of an accused's constitutional rights was harmless error. Harrington v. California (1969),395 U.S. 250, 254, 89 S.Ct. 1726.
 {¶ 26} Here, the trial court's ruling limiting defendant's cross-examination of Kallay was a violation of defendant's constitutional right to confrontation. State v. Rapp (1990),67 Ohio App.3d 33, 36, citing Delaware v. Van Arsdall (1986),475 U.S. 673, 106 S.Ct. 1431 (stating that "[t]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination"). Moreover, the record does not demonstrate the error was harmless beyond a reasonable doubt. Rather, all the evidence linking defendant to the murder is conflicting, and the only person to testify that defendant fired at Wilder was Williams, who admitted he carried a 9mm weapon and fired the weapon in Madison's apartment. Coupling that admission with the evidence that the bullet fragment removed from Wilder was fired from a 9mm, .38 or .380 weapon, Williams' credibility was significant to defendant's defense.
 {¶ 27} Williams' credibility, in turn, depended in part on the results of the discourse with Kallay about the statute of limitations. Indeed, the testimony from Kallay not only undermined defendant's potential argument that Williams had a motive to fabricate his version of the events leading to Wilder's murder, but it left the jury with the belief that if defendant were not found guilty, Wilder's murder would go unanswered. Thus, we cannot say the trial court's error in limiting defendant's cross-examination of Williams did not contribute to defendant's conviction. Accordingly, defendant's single assignment of error is sustained.
 {¶ 28} Having sustained defendant's single assignment of error, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.
Judgment reversed and case remanded.
Petree and Watson, JJ., concur.