[Cite as *State v. Brooks*, 2012-Ohio-5235.]

**IN THE COURT OF APPEALS OF OHIO**
**THIRD APPELLATE DISTRICT**
**HANCOCK COUNTY**

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                        CASE NO. 5-11-11

    v.

MACK E. BROOKS, III,                     O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Hancock County Common Pleas Court
Trial Court No. 2009 CR 105

**Judgment Affirmed**

Date of Decision: November 13, 2012

APPEARANCES:

    *Dennis C. Belli and Joseph E. Scott* for Appellant

    *Mark C. Miller and Alex K. Treece* for Appellee

Case No. 5-11-11

**WILLAMOWSKI, J**.

{¶1} Plaintiff-Appellant, Mack E. Brooks III ("Brooks"), appeals the judgment of the Hancock County Court of Common Pleas sentencing him to seven years in prison after a jury found him guilty of aggravated possession of drugs. On appeal, Brooks contends that many of his constitutional rights were violated because of numerous errors by the trial court including the denial of his motion to suppress, the denial of his right to effective assistance of counsel, the consolidation of his trial with that of his co-defendant, and joint representation by the same attorney as his co-defendant. He also claims that the jury's decision was not supported by sufficient evidence and was against the manifest weight of the evidence. For the reasons set forth below, the judgment is affirmed.

{¶2} On June 2, 2009, the Hancock County Grand Jury returned an indictment against Brooks, charging him with aggravated possession of drugs (oxycodone pills)[1] in violation of R.C. 2925.11(A), in an amount equal to or exceeding five times the bulk amount, but less than fifty times the bulk amount, a felony of the second degree. The Grand Jury also returned a separate indictment against Brooks' co-defendant, Jamila Smith ("Smith"; Brooks and Smith together, "Defendants"), also for aggravated possession of drugs.

---

[1] The original indictment stated that the drugs were Oxycontin. However, the laboratory report indicated that they were oxycodone. Both drugs are Schedule II controlled substances, and the difference in the type of drug did not change the quantification that the drugs were five to fifty times bulk amount. The prosecution moved to have the indictment amended, and the defense did not have any objection. (1/3/11 2011 Hrg. Tr. 28)

-2-

{¶3} The charges arose after State Highway Patrol Trooper Kurt Beidelschies stopped Brooks for a marked lanes violation shortly before midnight on May 22, 2009. (Trial Tr. 253) Brooks and his passenger, Smith, were unable to provide a valid copy of the rental agreement for the vehicle he was driving, and they gave inconsistent stories about their travel plans. (Trial Tr. 256; 260-61) While waiting to obtain verification of Brooks' driver's license and a valid rental agreement, the trooper called for assistance from a canine unit. (Trial Tr. 261) Deputy Frederick Smith of the Hancock County Sheriff's Department, and his trained dog, "Becky," arrived at the scene. When Becky alerted on the vehicle, the trooper placed Brooks and Smith in investigative detention in the rear of his cruiser and conducted a search of the vehicle. (Trial Tr. 262-64) A second trooper, Matthew Geer, arrived to assist. (Trial Tr. 464)

{¶4} During the search, the officers found marijuana, pictures of Brooks holding large sums of money, an empty prescription pill bottle for oxycontin, money ledgers and seven cell phones. (Trial Tr. 266) The search by the side of the interstate lasted approximately thirty minutes after which time the vehicle was driven to the Ohio State Highway Patrol Findlay Post, approximately seven miles from the stop point, to continue the search. (Trial Tr. 273-74) Once back at the station, all three officers continued to search the vehicle. Within the first 5-10 minutes, Trooper Geer noticed that the "B-Pillar" on the driver's side of the

vehicle was loose, and they discovered a large quantity of pills hidden inside.[2] (Trial Tr. 275-76)

{¶5} After discovering the pills, Trooper Beidelschies asked if either of the Defendants would like to talk with him. Smith indicated that she would be willing to talk, so Trooper Beidelschies informed Smith of her Miranda rights and began to question her. Smith confessed to the trooper that they were driving to West Virginia to drop-off and pick up money, and that Brooks had agreed to pay her $500 to accompany him. (Trial Tr. 295; 301-2, Exhibit 6) She admitted that this was the second time she had made this trip down to West Virginia with Brooks. Smith signed the confession form, handwritten in part by the trooper, acknowledging their involvement in transporting the pills. (Trial Tr. 302, Ex. 6)

{¶6} Gene Murray, an Ohio attorney, was retained by Brooks and entered his appearance for both Brooks and Smith on June 10, 2009. Brooks and Smith entered pleas of "not guilty" and were released on bond. In July 2009, Mr. Murray filed a Motion to Suppress, citing multiple grounds. After several continuances, suppression hearings were held in September 2009 and March 2010. The trial court denied the motion to suppress on June 21, 2010.

{¶7} On September 13, 2010, Mary Hickey, an attorney licensed in Michigan, filed a motion to appear pro hac vice as counsel for both Defendants.

---

[2] The "B-pillar" is the vertical support post on the driver's side between the floor and the roof, separating the front and rear passenger compartments.

Her motion represented that Mr. Murray would remain as local counsel to assist and advise her with respect to Ohio practice and procedure. On September 28, 2009, Mr. Murray filed a motion to withdraw as counsel indicating that Brooks and Smith had "employed newly retained counsel, Mary S. Hickey, esq., as * * * defense attorney, to replace the undersigned movant counsel Murray." The trial court granted Mr. Murray's motion the same day. The following day, the trial court granted Ms. Hickey's motion to appear pro hac vice.

{¶8} During an October 8, 2010 status conference, the trial court ordered the scheduling of separate trial dates for each defendant to avoid constitutional violations under *Bruton v. United States*, 391 U.S. 123 (1968).[3] (10/8/10 Hrg. Tr. 40-42). However, for reasons not evident in the record, both cases were combined and consolidated for trial on January 3, 2011. As they were waiting for the jurors to arrive for orientation on the day scheduled for trial, the trial court and attorneys discussed some preliminary matters on the record.

{¶9} First, the trial court questioned Ms. Hickey concerning her decision, and her clients' decision, to allow Ms. Hickey to jointly represent them. (1/3/11 Hrg. Tr. 4) Ms. Hickey stated that she had found a waiver of potential conflicts signed by both Defendants in the file she "inherited" from Mr. Murray, and that she had talked with both Defendants about the conflict and informed them it was a

---

[3] In *Bruton*, the United States Supreme Court held that a co-defendant's statement implicating a defendant cannot be used in a joint trial unless the co-defendant is available for cross-examination. *Bruton*, 391 U.S. at 127-128.

waiveable matter. And, the retainer agreement they both signed with her had stated that they both had the right to separate counsel and that their interests would be better served if they were represented by separate counsel. (*Id.* at 5) Ms. Hickey also stated that she met separately with Smith to make sure that she wanted to go forward with her as their joint attorney, "particularly in light of the State's offer to allow [Smith] to plead to a reduced charge if she would testify against Mr. Brooks." (*Id.*) Ms. Hickey stated that she was satisfied that the waivers were knowing and voluntary. (*Id.*)

{¶10} The trial court also addressed the potential problem of having a joint trial and whether the admission of Smith's statement would violate any constitutional rights under *Bruton* and *Crawford v. Washington*, 541 U .S. 36 (2004).[4] Ms. Hickey indicated that her clients would be willing to waive any *Bruton* issues and the prosecution prepared a waiver for the Defendants to sign. (1/3/11 Hrg. Tr. 5-6) The trial court then granted Ms. Hickey's request for a continuance, due to the prosecution's failure to timely provide requested discovery materials that Ms. Hickey claimed she needed for trial.

{¶11} The joint trial was finally held on February 7, 8, and 9, 2011, nearly two years after the initial traffic stop. Trooper Beidelschies, Trooper Geer, and

---

[4] In *Crawford*, the United States Supreme Court held that a defendant's federal confrontational constitutional rights are violated by the admission of "testimonial" statements of witnesses absent from trial unless the witness is unavailable to testify and when the defendant had a prior opportunity to cross-examine the witness.

Deputy Smith testified as witnesses for the State, describing what occurred when Trooper Beidelschies made the initial traffic stop, when Deputy Smith arrived and Becky alerted on the vehicle, and how they conducted the initial search of the vehicle beside the interstate. After finding the marijuana, photos of Brooks with quantities of money, the ledgers, an empty pill container, a plastic baggie, and multiple cell phones, the officers testified that the finding of these "criminal indicators" led them to believe that there might be a significant amount of drugs in the vehicle. (Trial Tr. 476) It was then decided to move the vehicle back to the station for purposes of the officers' safety and so that they could conduct the search with better lighting and the availability of tools to facilitate searching the vehicle, especially given that they had found evidence of tampering with the seat bolts, which could indicate the presence of a hidden compartment. (*Id.* at 274; 457, 463) All three of the officers were present when Trooper Geer found several bags containing over one-thousand pills hidden in the B-Pillar. (*Id.* at 492) The officers recognized the pills to be narcotics because of their markings, and divided the tablets between the three of them for counting, in order to facilitate the counting process. (*Id.* at 342-46) The testimony from all three of the officers as to what occurred was consistent with each of the other's testimony.

{¶12} The video record of the traffic stop and initial search from Trooper Beidelschies' vehicle's video camera was also played for the jury. (State's Exhibit

7) However, this video recording was incomplete and ended before the search was concluded. Trooper Beidelschies testified that he did not realize that the video card was almost full when he began his shift that evening and that it had stopped recording because it had run out of memory space. (Trial Tr. 431-35) They did not record the search of the vehicle back at the Highway Patrol Post because it was not typical to do so, there was no recording equipment in the area where they conducted the search, and there was no reason to record the search because there were three officers present to witness what was occurring. (Trial Tr. 492) Trooper Geer testified that the Defendants also witnessed the search. (3/25/10 Suppression Hrg. Tr. 25)

{¶13} Heather Sheskey, a forensic chemist and experienced criminologist with the Ohio State Highway Patrol Crime Laboratory, testified as to the process of analyzing the drugs, the chain of custody, the quantity of pills that she tested, and the fact that the pills were various strengths of Oxycontin, which was a proprietary name for these pills, which contained the drug oxycodone. (Trial Tr. 384-409.) Trooper Beidelschies had testified that he was "embarrassed" because there was a discrepancy between the amount of pills that he had reported as being found (1,152), the amount of pills he testified to at the suppression hearing (1,159), the amount of pills in his property report (1,418); and the amount of pills in Ms. Sheskey's laboratory report (1,132). However, he indicated that the

discrepancy had probably occurred because they had divided the drugs up to be counted between the three officers, with each officer counting either the 40 mg., 60 mg., or 80 mg. pills. (Trial Tr. 372) Trooper Beidelschies testified that their initial count was more of a "rough count" on the date of the traffic stop; that their counts definitely revealed that they had over one-thousand pills; and, that the final official tally would be what the crime lab determined because it would have the machinery to do a more accurate count. (*Id.* at 348)

{¶14} In any case, Ms. Sheskey confirmed that she had no doubt that the pills contained in State's Exhibit 8 were Oxycontin 80 mg. pills containing oxycodone; that that there were 390 tablets of this strength in total; that the bulk amount for the drug in this strength was 6 tablets; that 50 times the bulk amount would be 300 tablets; and, that there were definitely more than 300 total of these tablets in the State's exhibits that contained the 80 mg. pill strength. (Trial Tr. 409-11)

{¶15} The Defendants' attorney cross-examined the State's witnesses extensively and tried to discredit their testimony by suggesting that the records of the chain of custody were insufficient; that there were discrepancies in the amount of pills alleged found; that the officers had failed to follow departmental procedures regarding making video and audio recordings of the events that transpired that night; that there was something improper in the fact that Trooper

Beidelschies had written most of Smith's confession; that there were no witnesses to Smith's statement; and, that it was improper to detain the Defendants for as long as they did and then to drive the vehicle back to the post to continue to the search. Ms. Hickey suggested that "evidence has been, if not manufactured, that it was actively misrepresented in the official record." (Trial Tr. 776-77, Defendants' Closing Argument)

{¶16} The defense also offered the testimony of a video forensic expert witness, Edward Primeau, who testified that it was his opinion that there were three possible reasons why the video terminated before the end of the search: the equipment malfunctioned, the storage device was full, or it was turned off or tampered with. (Trial Tr. 708-12) He believed this video had been turned off. (*Id.*) However, on cross examination, he acknowledged that he could not state how much recording time may have been left on the memory at the time the recording commenced. (*Id.* at 714)

{¶17} After considering all of the testimony and the exhibits that were admitted, the jury found both Brooks and Smith guilty of aggravated possession of drugs, a felony of the second degree. The matter was set for sentencing.

{¶18} At the March 2, 2011, sentencing hearing, Brooks and Smith appeared with new defense counsel and indicated that they no longer wished to have Ms. Hickey represent them. Ms. Hickey was then discharged as defense

counsel, and Stephanie Lape and Adam Bleile commenced representation of the Defendants.

{¶19} The new defense counsel had filed a motion for a mistrial pursuant to Crim.R. 33(A)(1), claiming that the Defendants were denied a fair trial due to an irregularity in the proceedings, namely the fact that they were represented by Ms. Hickey, who they claim was not properly admitted pro hoc vice to practice law in the State of Ohio. (Sentencing Tr. 52) After considering the arguments of the parties, the trial court found that there was no evidence that the Defendants did not receive a fair trial and denied the motion for a new trial. (Sent. Tr. 55; Mar. 22, 2011 Decision)

{¶20} The trial court then proceeded to separately sentence the Defendants. The State requested the maximum 8-year sentence and the maximum $15,000 fine for Brooks, based upon Brooks' significant criminal history. The trial court sentenced Brooks to a mandatory 7-year prison term and a $10,000 fine.[5] (Mar. 24, 2011 J.E.)

{¶21} It is from this judgment that Brooks now appeals, raising the following eight assignments of error for our review.

---

[5] The trial court sentenced Smith to two years in prison. (May 12, 2012 Nunc Pro Tunc J.E.). The trial court stated that it believed that, based upon the evidence in the record, Brooks' role was considerably more significant than Smith's. (Sent. Tr. 82)

**First Assignment of Error**

**[Brooks'] conviction for aggravated possession of drugs is not supported by evidence sufficient to satisfy the requirements of the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution; or alternatively, is against the manifest weight of the evidence.**

**Second Assignment of Error**

**The court of common pleas committed reversible error when it denied [Brooks'] motion to suppress the oxycodone that was seized by the highway patrol during a warrantless search of his rental vehicle in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the Ohio Constitution.**

**Third Assignment of Error**

**The existence of an actual conflict of interest arising from defense counsel's simultaneous representation of [Brooks] and his Co-Defendant adversely affected counsel's performance and deprived him of his right to the assistance of unconflicted counsel under the Sixth and Fourteenth Amendments to the United States Constitution.**

**Fourth Assignment of Error**

**The common pleas court's failure to conduct an adequate rights waiver colloquy, its perfunctory acceptance of a defectively-worded "*Bruton* waiver," and its consolidation of [Brooks'] jury trial with the trial of his Co-Defendant constituted plain error and violated his right of confrontation and right to due process under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.**

## Fifth Assignment of Error

**The admission of the "criminal indicators" testimony of the state trooper and the oxycodone pills without an adequate chain of custody violated the Rules of Evidence and deprived [Brooks] of his due process right to a fundamentally fair jury trial in violation of Fifth, Sixth and Fourteenth Amendments to the United States Constitution.**

## Sixth Assignment of Error

**The prosecutor's improper remarks regarding the accusatory statements of the Co-Defendant and [Brooks'] post-*Miranda* silence, coupled with the failure of the trial court to give limiting or corrective instructions to the jury, constituted plain error and violated [Brook's] right of confrontation and due process right to a fundamentally fair jury trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.**

## Seventh Assignment of Error

**The common pleas court's failure to conduct proceedings in [Brooks'] presence regarding local counsel's motion to withdraw, and its subsequent denial of his motion for a new trial for irregularity in the proceedings, was error and violated his right to an Ohio-licensed attorney and right to be present during all critical stages of the prosecution under Crim.R. 43 and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.**

## Eighth Assignment of Error

**[Brooks] was denied his right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.**

{¶22} Because several of Brooks' assignments of error deal with similar and over-lapping issues, we shall combine our discussion of some of the assignments of error and address some of the issues out of order.

*Second Assignment of Error – Denial of Motion to Suppress*

{¶23} The second assignment of error asserts that the trial court erred when it denied Brooks' pretrial motion to suppress evidence seized from the rental vehicle. Brooks maintains that under the Exclusionary Rule, the State should have been prohibited from using the evidence obtained through what he characterizes to be an illegal search. Brooks has not challenged the probable cause for the original traffic stop but he contests (1) the length of the initial detention of the vehicle until the arrival of the canine unit; (2) the search of the passenger compartment, when the canine alerted only on the trunk; and, (3) moving the vehicle to the patrol post for a more extensive search.

{¶24} The United States Supreme Court has held that "[t]he Fourth Amendment [of the United States Constitution] provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *.' This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." (Emphasis added.) *Terry v. Ohio*, 392 U.S. 1, 8–9 (1968). Similar protection

exists pursuant to Section 14, Article I of the Ohio Constitution. *See State v. Wilson*, 3d Dist. No. 5–07–47, 2008–Ohio–2742, ¶ 16. When evidence is obtained as a result of an unlawful search and seizure, it must be suppressed. *Id.*, citing *Mapp v. Ohio*, 367 U.S. 643 (1961).

{¶25} Our review of a trial court's ruling on a motion to suppress presents a mixed question of fact and law. *State v. Burnside*, 100 Ohio St.3d 152, 2003–Ohio–5372, ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id.* Therefore, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. *Id.* However, with respect to the trial court's conclusions of law, our standard of review is de novo and we must decide whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 710 (4th Dist.1997).

{¶26} When an individual has been detained so that the police may investigate a traffic violation, the police may detain that person for the length of time necessary to check the driver's license, vehicle's registration, and the vehicle's license plate. *State v. Batchili*, 113 Ohio St.3d 403, 2007–Ohio–2204, ¶ 12. "In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the

circumstances and consider whether the officer diligently conducted the investigation." *Id.*, quoting *State v. Carlson*, 102 Ohio App.3d 585, 598 (9th Dist.1995).

{¶27} If, during the investigation of the events that gave rise to the initial stop, the officer discovers additional facts from which it is reasonable to infer additional criminal activity, the officer is permitted to lengthen the duration of the stop to investigate such suspicions. *State v. Williams*, 9th Dist. No. 09CA009679, 2010–Ohio–3667, ¶ 15, citing *Batchili*, 113 Ohio St.3d 403 at ¶ 15; *State v. Robinette*, 80 Ohio St.3d 234, 241, 1997–Ohio–343. However, a law enforcement officer needs no suspicion to request a canine sniff nor does the officer need suspicion to conduct an exterior canine sniff of the vehicle as long as it is done contemporaneously with the legitimate activities associated with the traffic violation. *State v. Hollins*, 3d Dist. No. 5-10-41, 2011-Ohio-5588, ¶ 32.

{¶28} After hearing the testimony and reviewing the video of the traffic stop, the trial court found that the Defendants had not been detained for an unreasonable amount of time before the dog alerted on the vehicle, and that their detention during that time was proper according to the law. The traffic stop occurred at approximately 11:15 p.m. (6/21/10 Hrg. Tr. 10) Trooper Beidelschies asked Brooks to exit his vehicle and sit in the patrol car while the trooper initiated a LEADS check to determine both the driver's and passenger's driving status and

the status of the rental vehicle, since the rental agreement they presented was not valid. (*Id.*) At approximately 11:23, the trooper returned to the vehicle to determine if another rental agreement existed which would provide verification of Brooks' ability to operate the car. (*Id.* at 11) The trooper became suspicious due to the inconsistent stories given by the Defendants as to why they were traveling, and he summoned the canine unit to assist. Deputy Smith and canine Becky arrived at 11:34, and the canine alerted to the vehicle within the first few minutes.

{¶29} The time from the initial traffic stop until Becky alerted was only about thirty minutes. (*Id.*) More importantly, the trooper still had not yet received verification that Brooks had renewed the rental agreement and was in lawful possession of the vehicle until *after* Becky hit on the vehicle. Based on these circumstances, the time spent to conduct the stop and background check was not excessive. "A traffic stop is not unconstitutionally prolonged when permissible background checks have been diligently undertaken and not yet completed at the time a drug dog alerts on the vehicle. *Batchili*, 113 Ohio St. 3d 403, ¶ 14. There is no evidence that the traffic stop was prolonged beyond legitimate purposes. The trooper had to wait until he received verification that Brooks was authorized to operate the vehicle before he could allow him to drive away. An officer may review a rental agreement in addition to conducting

-17-

background checks of the driver's license and the vehicle's registration. *State v. Hollins*, 3d. Dist. No. 5-10-41, 2011-Ohio-5588, ¶¶ 34-35.

**{¶30}** Next, Brooks claims that because the canine alerted on the trunk area, and they found Smith's purse containing a small amount of marijuana in the trunk, the officers had no reason or right to continue searching the passenger compartment. Smith acknowledged that she had a small amount of marijuana for personal use in her purse that was located in the trunk. Brooks argues that the trooper should have issued a misdemeanor citation for the marijuana and concluded the traffic stop.

**{¶31}** Brooks' argument fails for several reasons. Ohio courts have consistently held that once a certified drug sniffing dog alerts to a vehicle, officers have probable cause to search the entire vehicle. *See e.g. State v. Chambers*, 3d Dist. 5-10-29, 2011-Ohio-1305, ¶ 17; *State v. Nguyen*, 157 Ohio App.3d 482, 2004-Ohio-2879 (6th Dist.), ¶ 22; *State v. Buckner*, 2d Dist. No. 21892, 2007-Ohio-4329, ¶ 19; *State v. Almanzan*, 9th Dist. No. 05CA0098-M, 2006-Ohio-5047, ¶15. Deputy Smith also testified that the location where the canine alerts is the location where the scent escapes the vehicle and may not necessarily be the actual location of the of the drugs. (Trial Tr. 597) And, once the officers found the marijuana in Smith's purse, they had no way of knowing that there was not more marijuana located elsewhere unless they searched the entire vehicle. Furthermore,

when the officers searched the trunk of the car, they found more items that they considered indicators of possible criminal activity that caused them to have probable cause to believe that the vehicle's occupants were engaged in drug-related activities.

{¶32} Lastly, Brooks maintains that the trial court erred in concluding that probable cause justified removing the vehicle to the post in order to search for hidden compartments. Brooks acknowledges that the "automobile exception" allows a police officer to conduct a warrantless search of portions of a motor vehicle provided he has probable cause to believe it contains evidence of a crime." *See Carroll v. United States*, 267 U.S. 132, 158-59 (1925). However, he again argues that once the marijuana in Smith's purse was found, the probable cause dissipated. And, he contends that the officers' statements that they moved the vehicle to the station was for their safety was merely a pretext because they had already searched the vehicle by the side of the road for thirty minutes.

{¶33} The United States Supreme Court has held that there is no prohibition in moving a car to the station in order to conduct a probable cause search under more practical, and perhaps safer, conditions. *Chambers v. Maroney*, 399 U.S. 42, 52 (1970) ("It was not unreasonable in this case to take the car to the station house. * * * A careful search at that point was impractical and perhaps not safe for the officers, and it would serve the owner's convenience and the safety of

his car to have the vehicle and the keys together at the station house.").  The probable cause factor that was present at the scene is "still obtained at the station house."  *Id.*  This logic has been followed by Ohio courts.  *See e.g. State v. Carpenter*, 9th Dist. No. 2667-M, 1998 WL 161289 (believing that they had probable cause to search the trunk, and having no other way to enter it, the officers towed the vehicle to the Medina Highway Patrol Post, where they could, if necessary, employ a locksmith to open the trunk); *State v. Jones*, 1st Dist. No. C-75272, 1976 WL 189698 (troopers moved the vehicle three miles to the patrol post where the lighting conditions were better and the troopers could conduct the search without the fear of being struck by the turnpike traffic).

{¶34} The trial court did question the officers' claim about the necessity of moving the vehicle for officer safety, since they had already been searching it by the side of the highway for thirty minutes.  However, when they began the search, they had no idea how long it might take, and it is understandable that concerns about safety may have increased the longer they were there and at risk.  However, their testimony indicates that their primary reason was to have access to better lighting, and tools, if necessary, since their initial search showed signs of tampering with the seat bolts that may have meant there was a secret compartment in the vehicle.  We find no error in the trial court's determination that once the existence of probable cause was established though the drug dog, there was no

constitutional impediment to moving the vehicle to finalize the search. (6/21/10 Hrg. Tr. 21-22)

**{¶35}** Based on all of the above, the trial court's decision to deny the motion to suppress was consistent with the facts in the record and the applicable law. Brooks' second assignment of error is overruled.

*Fifth Assignment of Error – Improper Admission of Evidence at Trial*

**{¶36}** In the fifth assignment of error, Brooks maintains that evidence concerning the so-called "criminal indicators" was irrelevant and inflammatory, and that its probative value was substantially outweighed by its prejudicial effect. Furthermore, he claims that the pills should have been excluded due to the State's failure to establish a satisfactory chain of custody or an accurate count.

**{¶37}** Evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A). It is well established that the decision to admit or exclude evidence is within the sound discretion of the trial court and that an appellate court will not disturb that decision absent an abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus; *State v. Swann*, 119 Ohio St.3d 552, 2008-Ohio-4837, ¶ 33. The trial court is vested with this discretion because it is in a much better position than we are to evaluate the authenticity of evidence and assess the credibility and veracity of witnesses. *State*

*v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160 ¶ 129. "Abuse of discretion" implies that the trial court's decision was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Furthermore, because there was no objection raised to this testimony, Brooks has waived all but plain error. In order to find plain error, Crim.R. 52(B) requires that there must be a deviation from a legal rule, the error must be an "obvious" defect in the trial proceedings, and the error must have affected a defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68. An alleged error constitutes plain error only if the error is obvious and, but for the error, the outcome of the trial clearly would have been different. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 108. Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Barnes,* 94 Ohio St.3d at 27.

{¶38} The officers testified that the photos of Brooks holding quantities of money, the money ledgers, the empty pill bottle, the plastic bag, multiple cell phones, multiple car rental agreements, and inconsistent stories indicated to them, based upon their professional experience, that such items and occurrences were often associated with criminal activity. The "criminal indicators" as Trooper Beidelschies called them, provided the officers with probable cause to continue searching the vehicle. These were simple facts that were necessary to describe

what occurred. It was also appropriate for the jury to consider the testimony concerning these items, along with the other evidence that was presented, and to decide for themselves whether this gave rise to an inference of drug activity in this case. We do not find that the admission of this testimony was an abuse of discretion, and it certainly did not affect Brooks' substantial rights or create a manifest miscarriage of justice.

{¶39} As to the "chain of custody" of the pills, the State has the burden of establishing the chain of custody of a specific piece of evidence but the State's burden is not absolute; "[t]he state need only establish that it is reasonably certain that substitution, alteration or tampering did not occur." *State v. Barzacchini*, 96 Ohio App.3d 440 (6th Dist.1994). As a general matter, "the state [is] not required to prove a perfect, unbroken chain of custody." *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 57, citing *State v. Keene*, 81 Ohio St.3d 646, 662 (1998). While authentication of evidence is a condition precedent to its admission, the condition is satisfied when the evidence is "sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A); *State v. Hunter*, 169 Ohio App.3d 65, 2006–Ohio 5113, ¶ 16. Evidence of a process or system to produce an accurate result is sufficient to satisfy the rule. Evid.R. 901(B)(9). Breaks in the chain of custody go to the weight afforded the evidence, not its admissibility. *State v. Blevins*, 36 Ohio App.3d 147, 150, (10th Dist.1987).

{¶40} The testimony of Trooper Beidelschies and the property control forms indicated a proper chain of custody for the pills. The trial court addressed this concern and found no faults with the chain of custody. During the instances that Brooks complains the records did not show the correct person with custody and control of the pills, Beidelschies explained that he was also with the pills during the times when multiple people were involved, so it was sufficient to only list his name; that the pills never left his custody and control during those times; and that this satisfied the procedures and requirements. Brooks also complains that the trooper used a gun locker to store and secure the pills at one point. Trooper Beidelschies explained that he maintained control of the key to that locker and the fact that it was placed in a "gun locker" rather than an "evidence locker" did not impair its chain of custody. (Trial Tr. 375-76)

{¶41} As to the inconsistent pill counts, Trooper Beidelschies testified that it was three or four o'clock in the morning by the time the three officers counted the pills and they were all tired from the night's activities involving the search and arrests. While it was unfortunate that the pill count was not completely accurate, he explained that it always showed there were over one thousand pills, and that he depended on the crime lab to establish a perfectly accurate count. Furthermore, because of the discrepancy, the State only admitted the 390 pills in the 80 mg. strength. The State only had to prove that there were more than 30 pills of that

strength to equal five times the bulk amount, so any inaccuracy in the count of pills over that number was immaterial, as long as it was clearly established that there were at least 30. (Trial Tr. 744-745)

{¶42} Here, Brooks' counsel did object to the admission of the pills, but we find that the trial court did not err in determining that there were no fatal flaws in the chain of custody. Brooks' fifth assignment of error is overruled.

*First Assignment of Error – Evidence Insufficient and Against Manifest Weight*

{¶43} In this assignment of error, Brooks argues that there was insufficient evidence to tie Brooks to the pills and find him guilty of aggravated possession because: (1) his mere presence in the rental vehicle was not sufficient to demonstrate constructive possession of the drugs; (2) Smith's inconsistent statements concerning the purpose of their trip and Smith's confession implicating Brooks must be disregarded because they are "testimonial" statements under *Crawford v. Washington*, 54 U.S. 36 (2004) and he did not have the opportunity to cross examine Smith; and, (3) the testimony concerning the multiple "criminal indicators" violated the rule against the impermissible stacking of inferences. Without this evidence, which Brooks asserts must be disregarded, he maintains that there was insufficient evidence to support his conviction as a matter of law.

{¶44} When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence

submitted at trial, if believed, could reasonably support a finding of guilt beyond a reasonable doubt. *See State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997–Ohio–52 (stating, "sufficiency is the test of adequacy"); *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). The standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. Jenks, supra; *Jackson v. Virginia*, 443 U.S. 307 (1979). This test raises a question of law and does not allow the court to weigh the evidence. *State v. Martin*, 20 Ohio App.3d 172, 175 (1st. Dist.1983).

{¶45} Brooks was found guilty of violating R.C. 2925.11(A), which provides "[n]o person shall knowingly obtain, possess, or use a controlled substance." "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. § 2925.01(K). The issue of whether a person charged with drug possession knowingly possessed a controlled substance "is to be determined from all the attendant facts and circumstances available." *State v. Teamer*, 82 Ohio St.3d 490, 492, 1998–Ohio–193.

{¶46} Possession may be actual or constructive. *State v. Cuffman*, 3d Dist. Nos. 3-11-01, 3-11-02, 2011-Ohio-4324, ¶ 31, citing *State v. Worley*, 46 Ohio

St.2d 316, 329 (1976). For constructive possession to exist, the State must demonstrate that the defendant was able to exercise dominion or control over the item, even if he/she does not have immediate physical possession of it, and was conscious of the object's presence. *State v. Hankerson*, 70 Ohio St.2d 87, 91, (1982); State v. Messer, 107 Ohio App.3d 51, 56 (9th Dist.1995). *See, also, State v. Cooper*, 3d Dist. No. 9–06–49, 2007–Ohio–4937, ¶ 25. The State may prove the existence of the various elements of constructive possession of contraband by circumstantial evidence. *State v. Jenks*, 61 Ohio St.3d at 259, 272–73.

{¶47} We find there was sufficient evidence that, when viewed in a light most favorable to the State, a rational trier of fact could have found that Brooks had constructive possession of the drugs. Although the vehicle involved was a rental vehicle, Brooks was the person listed on the rental agreement and had recently renewed the rental agreement. The fact that a defendant possesses the keys to an automobile is a strong indication that he possesses the automobile and the items inside. *State v. Ray*, 9th Dist. No. 03CA0062-M, 2004-Ohio-3412, ¶ 23. Brooks was driving the vehicle at the time and the drugs were located within his reach, hidden in the column immediately behind and adjacent to the driver's seat. He was certainly able to exercise dominion and control over the contraband.

{¶48} In *State v. Rodgers*, 3d Dist. No. 5-10-35, 2011-Ohio-3003, ¶ 30, this Court found that there was sufficient evidence to find that the defendant had

constructive possession of the drugs found in the rental vehicle. Even though the vehicle was not rented in his name, the defendant was driving the vehicle and acknowledged that he was the person responsible for returning the vehicle. *Id. See also State v. Reed*, 10th Dist. No. 09AP-84, 2009-Ohio-6900, ¶ 21 (although uncertain whether the defendant owned or rented the car, when a person is the driver or a passenger in a car in which drugs are within easy access, a trier of fact may find constructive possession).

{¶49} Brooks cites to our decision in *State v. Cooper*, 3d Dist. No. 9-06-49, 2007-Ohio-4937, and asserts that a defendant's "mere presence in a non-owned motor vehicle occupied by more than one person is insufficient to demonstrate guilty knowledge and constructive possession." (Appellant's Brief, p. 6) However, *Cooper* is distinguishable from the facts in this case in several ways. Cooper was merely a passenger in the vehicle, which was driven by and under the control of a known drug-dealer. There was no evidence that Cooper knew where the drugs were or that they were within his reach, and there was evidence that he had never touched the drugs and was *not* a part of the drug transaction that had occurred. *Id.* at ¶ 29. In this case, Brooks was clearly the person in control of this vehicle, even though it was a rental vehicle. There was no contradictory evidence that would have indicated the drugs belonged to someone else, like in *Cooper*.

{¶50} And, the officers also testified as to finding seven cell phones and pictures of Brooks holding large amounts of cash. In *Westlake v. Wilson*, 8th Dist. No. 96948, 2012-Ohio-2192, ¶ 38, the appellate court heard testimony that drug dealers often have large amounts of cash and multiple cell phones on them, and found this to be a factor in finding constructive possession. The court recognized that merely having a cell phone is ubiquitous and is not ipso facto proof that it was used in drug trafficking, but the same cannot be said about having multiple cell phones. *Id.*; *see also State v. Byers,* 8th Dist. No. 94922, 2011–Ohio–342, ¶ 9.

{¶51} "Mere presence in the vicinity of drugs, coupled with another factor probative of dominion or control over the contraband, may establish constructive possession." *Cooper*, at ¶ 26. Here, Brooks was close enough to the drugs to establish dominion and control over them; he was driving the car; the vehicle had been rented to him and he had renewed the rental agreement; Brooks and Smith gave inconsistent stories about what they were doing; there were pictures of Brooks holding quantities of money, along with ledgers; there was an empty bill bottle of oxycontin (not in Brooks' name); and seven cell phones were found in the vehicle. There were multiple factors present here which would allow a reasonable jury to find that Brooks possessed the pills that were found in the car he was driving.

{¶52} However, Brooks also argues that inferring constructive possession from the multiple cell phones, inconsistent stories, and other circumstantial evidence would amount to an improper "stacking" of inferences. Brooks is mistaken because in this case, the multiple inferences are not "stacked" upon one another, the multiple inferences all point to the same conclusion – that Brook possessed the drugs.

> Inferences may be drawn from circumstantial evidence so long as one inference is not drawn wholly from a fact the existence of which rests solely on another inference. Thus, a jury may base its verdict partly on reasonable inferences drawn from facts in evidence, and partly on other inferences drawn from the same facts and common human experience. Such is not an impermissible stacking of inferences.

*State v. Carver*, 3d Dist. No. 11-95-14, 1996 WL 197427, citing *Motorists Mut. Ins. Co. v. Hamilton Township Trustees*, 28 Ohio St.3d 13 (1986).

{¶53} And finally, Brooks maintains that Smith's statement implicating him must be disregarded in attempting to prove his guilt, because a co-defendant's confession or admissions cannot be used as evidence of his guilt, especially when he did not have the opportunity to confront Smith about the statements. However, as discussed in our response to the fourth assignment of error below, even if the statement made by Smith is not considered and is completely disregarded, there was more than sufficient evidence to support a finding of guilt beyond a reasonable doubt. The use of Smith's confession would probably have been

necessary in order to prove that Brooks was *trafficking* in drugs, as her statement constituted the primary evidence that they were making the trip to West Virginia in order to sell the drugs, and that this was not the first time they had done so. However, Brooks was not charged with trafficking. Brooks was charged only with *possession* of the drugs, and there was ample evidence to support that conviction.

{¶54} Finding that there was sufficient evidence to support Brooks' conviction, we look at the second part of this assignment of error, claiming that the decision was against the manifest weight of the evidence. In determining if a conviction is against the manifest weight of the evidence, an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Mendoza*, 137 Ohio App.3d 336, 346–347 (3d Dist.2000), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, (1st Dist.1983); see, also, *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. *Thompkins* at 387.

{¶55} Although the appellate court acts as a "thirteenth juror," it still must give due deference to the findings made by the fact-finder. *State v. Thompson*, 127

Ohio App.3d 511, 529 (8th Dist.1998). The fact-finder, being the jury, occupies a superior position in determining credibility. *Id*. When examining witness credibility, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123 (1986).

{¶56} Two state troopers and a sheriff's deputy all presented consistent, believable, logical, and uncontroverted testimony concerning what occurred the night that Brooks was stopped and the drugs were found. There was no evidence or testimony to contradict their testimony, other than Mr. Primeau, who testified that it was his opinion that the video recording had been turned off. However, he acknowledged he had no real way to determine if that had occurred. There was no evidence – or even a theory – offered as to why the officers would have turned off the video and somehow conspired to misrepresent what occurred that evening. The portion of the video that was shown to the jury and admitted into evidence was consistent with the testimony of the officers and would support the testimony that the video stopped recording because it ran out of memory space. It was up to the jury to decide the credibility of the witnesses.

{¶57} Brooks also cites legitimate uses for each of the incriminating items that were found in the vehicle, and claim that they don't necessarily indicate

criminal activity. While that may be true for each item individually, it stretches credibility to infer a completely innocent use for each and every item when they are all viewed together under the totality of the circumstances. We cannot say that the jury lost its way or created a miscarriage of justice.

{¶58} We find that there was sufficient competent, credible evidence to find that Brooks was guilty of aggravated possession of drugs, and that the jury's decision was not against the manifest weight of the evidence. The first assignment of error is overruled.

*Fourth Assignment of Error – Joint Trial and Defective Bruton Waiver*

Brooks claims that the consolidation of his trial with the trial of his co-defendant amounted to plain error. If the trials had been held separately, Smith's statement, which also implicated Brooks, would not have been admissible and the jury would not have heard the trooper's testimony concerning his interview with Smith. Brooks claims that without the information in Smith's statement, there would have been insufficient knowledge to find constructive possession.

{¶59} Brooks acknowledges that he and his co-defendant agreed to waive any *Bruton* issues, and signed a waiver provided by the prosecutor. However, he asserts that his waiver was invalid because the language of his waiver form was defective and misleading; his counsel's conflict of interest in representing both co-defendants precluded him from receiving competent and unbiased advice; and, the

trial court failed in its duty to engage Brooks in a meaningful colloquy for purposes of ensuring he was making a knowing intelligent and voluntary waiver.

**{¶60}** The Sixth Amendment to the United States Constitution guarantees that a person accused of committing a crime has the right to confront and cross-examine witnesses testifying against him. *Pointer v. Texas*, 380 U.S. 400, 406 (1965). Section 10, Article I of the Ohio Constitution contains a similar guarantee of confrontation. The United States Supreme Court in *Bruton v. United States*, 391 U.S. 123 (1968), held that an out-of-court statement of a co-defendant cannot be admitted into evidence against the other defendant because the defendant is unable to attack the statement by cross-examination (unless the co-defendant testifies and waives his right against self-incrimination). Thus, the admission of the co-defendant's statement violated Bruton's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. *Id.* The Ohio Supreme Court, in *State v. Moritz*, 63 Ohio St.2d 150 (1980), paragraph one of the syllabus, followed *Bruton* and recognized that an accused's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment is violated in a joint trial with a non-testifying co-defendant by the admission of the co-defendant's extrajudicial statements incriminating the accused.

**{¶61}** Because there was no objection to the joint trial, Brooks concedes that review is again under the plain error standard. Crim.R. 52(B) distinguishes

between errors to which a defendant objected at trial and errors that a defendant failed to raise at trial. If the defendant failed to raise an error affecting substantial rights at trial, an appellate court reviews the error under the plain-error standard in Crim.R. 52(B). Under that rule, the defendant bears the burden of demonstrating that a plain error affected his substantial rights. *State v. Perry*, 101 Ohio St.3d 118, 120 (2004).

{¶62} However, the State argues that any evaluation of this alleged error must begin with the doctrine of "invited error" because both Brooks and his co-defendant sought joint representation by Ms. Hickey and a joint trial. (1/3/11 Hrg. Tr. 8) "A party cannot take advantage of an error he invited or induced." *State v. Seiber*, 56 Ohio St.3d 4, 17 (1990). This Court has held that "it is invited error when a party asks a court to take some action later claimed to be erroneous." *State v. Harper*, 3d Dist. No. 1-05-79, 2007-Ohio-109, ¶ 20, citing *State v. Campbell*, 90 Ohio St.3d 320, 2000–Ohio–183. Other Ohio courts have upheld the consolidation of cases and waiver of any rights under *Bruton* under the theory of invited error. In *State v. Doss*, 8th Dist. No. 84433, 2005-Ohio-775, ¶ 5, as in this case, the defendant was present while trial counsel agreed to waive any *Bruton* issues. The Eighth District Court of Appeals held that he could not later claim this as error because "[t]his is precisely the situation the invited error doctrine seeks to avert." *Doss* at ¶ 7, quoting *United States v. Jernigan*, 341 F.3d 1273, 1290 (7th

Cir.2003) (holding a criminal defendant "may not make an affirmative, apparently strategic decision at trial" regarding its underlying *Bruton* claim, and "then complain on appeal that the result of that decision constitutes reversible error"). *Accord State v. Jennings*, 10th Dist. No. 09AP-70, 09AP-75, 2009-Ohio-6840, ¶¶ 75-76.

**{¶63}** The trial court discussed this potential conflict, on the record and in the presence of Brooks multiple times. On October 8, 2010, the trial court warned against a joint trial, but left the decision as to whether to try the cases together up to Brooks and his attorney. The trial court proposed holding the trial for Smith in December 2010, and Brooks' trial on January 3, 2011, stating:

> Obviously, Ms. Hickey, if you don't object, they could be tried together, but that's an issue you need to think about and talk to [the prosecutor] about. I just don't want to have anyone's Constitutional Rights impaired if there is a joint trial and that was an issue before, but if, and that could be potentially a *Bruton* case for Mr. Brooks if Ms. Smith's statement is used, and I don't want to feel like he has to testify under those circumstances. So, * * * Mr. Murray and I and [the prosecutor] * * * decided it might be best to try them in separate order to avoid any such problems. But if you want to consider that and certainly talk to your clients, that's fine.

(10/8/10 Hrg. Tr. 42)

**{¶64}** On January 3, 2011, just prior to the scheduled joint trial, the trial court again raised the issue of a potential *Bruton* issue, but Ms. Hickey assured the trial court that it was Brooks' desire to go forward with the joint trial.

The Court: * * * isn't there also a claim by the State that Ms. Smith may have made some admission, and Mr. Brooks did not. So doesn't that create a *Bruton* problem potentially?

Ms. Hickey: Yes, there is. And one of the things that we – when we discussed going to trial jointly, that was a concern raised by both [the prosecutor] and the Court. *My clients understand that – particularly Mr. Brooks understand that if he were going to trial by himself – the statement by Ms. Smith probably would not come into evidence against him * * *. But he understands that. He is willing to go to trial jointly with her. And as part of our agreement in this we indicated that we would waive any Bruton problems.*

[The prosecutor] has given me a copy this morning of two waivers of the constitutional rights under *Bruton*. It actually would only have to be signed, I think, by Mr. Brooks. And we would be more than happy to have them sign that. [*Mr. Brooks*] *understands more than the average client about what's going on with that.* And I think, again, he – it's knowing and I think it's voluntary.

* * 8

The Court: Very well. Ms. Hickey, you indicated you have discussed this thoroughly with both your clients and they're willing to proceed to trial jointly * * * ?"

Ms. Hickey answered affirmatively, and then the trial court directly addressed each defendant individually:

The Court: Mr. Brooks, is that correct, you thoroughly discussed this issue with Ms. Hickey and the other perils of a joint trial?

Mr. Brooks: Yes, sir.

(Emphasis added.) (1/3/11 Hrg. Tr. 6-8)

**{¶65}** The Defendants then signed the *Bruton* waivers that the prosecutor had prepared and Ms. Hickey had reviewed. We acknowledge that the wording on

-37-

the waivers was not completely accurate, as it referenced the Defendants' Fifth Amendment rights against self-incrimination, rather than Brooks' Sixth Amendment right to confrontation.[6]  However, in *State v. Kuhn*, 9th Dist. No. 05CA008859, 2006-Ohio-4416, the trial court held that the defendants' repeated *oral waiver* on the record (in proceedings similar to that which occurred in this case) of any *Bruton* issues was sufficient indication that they wished to proceed to trial jointly and that it  was "a clear[] case of a voluntary, intelligent, and knowing wavier of a right." *Id.*  at ¶ 10.  The trial court asked several times if the defendant wanted to waive his rights and, as in the case before us, it never received any indication that he did not wish to waive his rights or that he did not understand them. *See Id*. at ¶¶ 7-10.

**{¶66}** Also in *Kuhn*, the trial court held that the defendant could not claim ineffective assistance of counsel concerning the waiver, when it was apparent on the record that he was advised of his rights, knew what statements were going to be admitted, and then waived said rights.  *Id.*  Likewise, in this case, Brooks claims that his waiver was not valid because of ineffective assistance of counsel

---

[6] The waiver was titled "Waiver of Constitutional Rights under "*Bruton v. United States*" and stated, "Now comes the Defendant, Mack E. Brooks, III, represented by Attorney Mary Hickey, and hereby waives any and all rights against self-incrimination concerning his codefendant, Jamila Smith, associated with *Bruton v. United States* (1968), 291 U.S. 123," and was signed, dated, and witnessed. Smith's was identical, except for the reversal of the names of the Defendants.  Technically, Ms. Smith's statement was correct, as her waiver acknowledged that she would agree to waive her Fifth Amendment rights not to testify and would potentially agree to testify and face cross-examination concerning her statement.  However, Smith was never called to testify.  Brooks' waiver should have stated that he was waiving his *Sixth* Amendment rights to confrontation.

due to Ms. Hickey's conflict. However, while we do acknowledge that a conflict existed (see Assignment of Error Three, below), Brooks does not point to any way in which this conflict actually prejudiced him in regards to his *Bruton* rights, and we do not find any such prejudice from the record. It was clear that Ms. Hickey's trial strategy was to discredit and cast doubt upon the validity and authenticity of the signed confession. On cross-examination, she continually challenged Trooper Beidelschies as to why only the first sentence of Smith's statement was written by Smith, and the rest was in his handwriting; why there was no witness signature; why the interrogation resulting in the statement had not been recorded; and whether the trooper had followed proper procedures in obtaining the statement.

{¶67} When discussing whether or not it was appropriate to go forward with a joint trial, while Brooks and Smith were present, the trial court warned "[t]hat would severely limit your opportunity to present any antagonistic defenses." (1/3/11 Hrg. Tr. 6) Ms. Hickey replied that possession was going to be the focus of the defense and that "there's nothing that we've ever viewed as antagonistic defenses, and we did discuss that as well." (*Id.* at 7) During closing arguments, Ms. Hickey stated:

> The only thing in her handwriting is a totally exculpatory, totally blameless statement. They were going to [West] Virginia "to drop off and pick up money." * * * Every single allegedly – every single thing that supposedly makes her or Mr. Brooks responsible for criminal conduct is in [Trooper B.'s] handwriting. All of it. * * *

> Nobody knows what happened after the camera was shut off * * *.
> Nobody knows beyond a reasonable doubt what happened that night.

(Trial Tr. 793-94) Based upon the trial strategy that his counsel chose, with the full knowledge of Brooks, there was no reason to ask for a limiting instruction on Smith's confession, or to otherwise exclude it or keep it from being offered. Their strategy was to imply that Smith's statement was fabricated or, in some way, not an authentic rendering of the facts. That strategy did not work and the jury chose to believe Trooper Beidelschies's testimony concerning the statement and the happenings that night. However, Brooks cannot claim error now when it was evident from the record that he knew exactly what was occurring and knowingly and intelligently agreed with the decision to hold a joint trial, being fully aware of the fact that Smith's statement would be admitted. *See State v. Elder*, 9th Dist. No. 25217 and No. 25259, 2011-Ohio-294, ¶¶ 14-19 (finding that the defendant's oral waiver of his right to confront and cross-examine was "a knowing, voluntary, intelligent waiver with regard to any *Bruton* issues" that the trial court anticipated were going to arise).

{¶68} Furthermore, even if we were to find that the doctrine of invited error was not appropriate in this case because of the poorly worded waiver form and Ms. Hickey's dual representation, and that the joint trial violated Brooks' rights of confrontation, a violation of *Bruton* does not necessarily require a reversal when there has been no prejudice. *See State v. Moritz*, 63 Ohio St.2d 150 (1980). The

Ohio State Supreme Court, when examining a similar *Bruton* issue, held that "[a] violation of an accused's right to confrontation and cross-examination is not prejudicial where there is sufficient independent evidence of an accused's guilt to render improperly admitted statements harmless beyond a reasonable doubt." *Id.*, at paragraph two of the syllabus. The Ohio Supreme Court did acknowledge that in this type of situation it may be advisable for the trial court to grant separate trials to avoid these confrontation problems.[7] *Id.* at 156. However, the Ohio Supreme Court found that an error of this sort may be harmless and does not mean that a conviction must be reversed. *Id*. at 155-156. In quoting the Supreme Court of the United States, the Court in *Moritz* declared:

> "The mere finding of a violation of the *Bruton* rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." (Citations omitted.)

*Moritz* at 156, quoting *Schneble v. Florida*, 405 U.S. 427, 430 (1972).

{¶69} The Tenth District Court of Appeals recently addressed this issue and found that the use of his co-defendant's statement at their joint trial was harmless because, even without the co-defendant's statement to the detective, the remainder of the evidence overwhelmingly proved that he was guilty beyond a reasonable

---

[7] In *Moritz*, the appellant had sought to have his trial severed from that of the co-defendant, but the trial court did not allow the severance.

doubt. *State v. Burney*, 10th Dist. No. 06AP-990, 2007-Ohio-7137, ¶ 54. The Court of Appeals stated:

> [E]rrors under *Bruton* are subject to harmless error review. *Harrington v. California* (1969), 395 U.S. 250, 252-254. Courts need not disturb convictions based on harmless error. *State v. Mardis* (1999), 134 Ohio App.3d 6, 22. In regards to constitutional errors, such as those under *Bruton*, courts determine whether the error was harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 24. Stated another way, the appellate court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. *State v. Phipps*, Franklin App. No. 03AP-533, 2004-Ohio-3226, at ¶ 25. Thus, where evidence against the accused is "'overwhelming,' a reviewing court concludes beyond a reasonable doubt that the denial of an accused's constitutional rights was harmless error." *Harrington* at 254, quoting *Chapman* at 23; *Phipps* at ¶ 25. In doing so, the court does not consider the erroneous material. *Mardis* at 22.

*Id.* at ¶ 53.

{¶70} As stated above in our response to the first assignment of error, there was overwhelming evidence, other than Smith's statement, that was more than sufficient to convict Brooks of possession of drugs. Therefore, any error in the admission of Smith's statement, due to the consolidation of their trials, must be considered harmless beyond a reasonable doubt, and would most certainly not be considered plain error. *See id.*; *Perry*, 101 Ohio St.3d at 120.

{¶71} Brooks, however, points to our decision in *State v.* [Mary] *Dixon*, 3d Dist. No. 8-02-44, 2003-Ohio-2547, in which we reversed Mary Dixon's conviction, finding that the decision to grant the State's motion to consolidate her

trial with that of her co-defendant/husband, Danny Dixon, Sr., amounted to plain error. In that case, this Court found that had not the two cases been tried together, the jury would not have been privy to Danny's testimony, and without that testimony, and the resultant impeachment evidence, there was clearly insufficient evidence to sustain Mary's conviction. However, that case is distinguishable for several reasons. First, it did not involve a *Bruton* confrontation issue because Mary's husband/co-defendant *did* testify. His incriminating testimony, along with the impeachment evidence that was admitted as a result of his decision to testify (which had been ruled inadmissible *except* for impeachment purposes), was the only competent and credible evidence before the jury.[8] *Id. at ¶* 14-15. Therefore, we found that the consolidation of the trials seriously affected her right to be tried solely on the evidence against her, rather than her co-defendant. *Id.* at ¶ 16.

{¶72} In contrast, we upheld the conviction against Mary's co-defendant/husband, finding that the use of Mary's statement to police as evidence against him at trial was a clear violation of the *Bruton* rule, but that the error was harmless. *See State v.* [Danny] *Dixon*, 152 Ohio App.3d 760, 2003-Ohio-2550, ¶ 33. In Danny's case, the violation of the *Bruton* rule was not prejudicial because there was sufficient independent evidence of the accused's guilt to render the

---

[8] There was evidence from a police informant, but this evidence was very weak as he was a convicted felon cooperating with the police for the purpose of placing himself in a better light.

improperly admitted statements harmless beyond a reasonable doubt. *Id.*, citing to *Moritz.*

**{¶73}** Based on all of the above, we find that the complaints raised by Brooks in this assignment of error should not be considered, because they were the result of invited error. And, even if the circumstances of this case would preclude the use of the invited error doctrine, there was sufficient independent evidence of Brooks' guilt so that any error in the consolidation of the trials and the admission of his co-defendant's confession could not be considered plain error, but would be merely harmless error. The fourth assignment of error is overruled.

*Sixth Assignment of Error – Prosecutor's Alleged Improper Remarks*

**{¶74}** In this assignment of error, Brooks charges that the prosecutor was guilty of misconduct because of statements he made in his closing argument. He asserts that improper comments concerning Brooks' post-*Miranda* silence and Smith's confession, along with the lack of any limiting or corrective instructions, constituted plain error.

**{¶75}** "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14, (1984). Prosecutors are granted wide latitude in closing argument, and the effect of any conduct of the prosecutor during closing argument must be considered in light of

the entire case to determine whether the accused was denied a fair trial. *State v. Maurer*, 15 Ohio St.3d 239, 266, 269 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 149, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶76} The right of an accused to remain silent, enunciated in *Miranda v. Arizona*, 384 U.S. 436 (1966), carries with it an implicit assurance that his silence will not be used against him. *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). "A defendant's decision to exercise his right to remain silent during police interrogation is generally inadmissible at trial either for purposes of impeachment or as substantive evidence of guilt." *State v. Perez*, 3d Dist. No. 4-03-49, 2004-Ohio-4007, ¶ 10, citing *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147. Use of a defendant's silence in the state's case-in-chief puts a defendant in the position of having to choose between allowing a jury to infer guilt from his silence or being forced to take the stand to explain his prior silence, thereby surrendering his right not to testify. *Perez*, 2004-Ohio-4007, at ¶ 20. However, the introduction of evidence regarding a defendant's decision to remain silent does not constitute reversible error if, based on the whole record, the evidence was harmless beyond any reasonable doubt. *State v. Zimmerman*, 18 Ohio St.3d 43, 45 (1985). The Ohio Supreme Court has held that "[a] single comment by a police officer as to a

suspect's silence without any suggestion that the jury infer guilt from the silence constitutes harmless error." *State v. Treesh*, 90 Ohio St.3d 460, 480 2001-Ohio-4; *State v. Roby*, 3d Dist. No. 12-09-09, 2010-Ohio-1498, ¶ 14.

{¶77} Because defense counsel did not object to the statements, we review the alleged errors under the plain error standard. An alleged error constitutes plain error only if the error is obvious and, but for the error, the outcome of the trial clearly would have been different. *State v. Yarbrough*, 95 Ohio St.3d 227, at ¶ 108.

{¶78} Brooks points to only one instance during direct examination and one during closing where the fact that Brooks did not volunteer to make a statement was briefly mentioned or indirectly implied. Neither statement referenced any action or non-action by Brooks, nor did the statements in any way attempt to suggest any guilt on the part of Brooks because of his silence.

{¶79} Trooper Beidelschies testified that he "asked if either of them wanted to talk to me," and then he testified that Smith said she did and he explained how he again informed Smith of her Miranda rights before he questioned her. (Trial Tr. 293-94) This statement was made entirely in the context of discussing Smith's signed Miranda statement and her confession, and there was no reference to Brooks.

{¶80} Later, during closing arguments, the prosecution stated the following: "Like any good officer [Trooper Beidelschies] kept going. He wanted to talk to Mack Brooks. He wanted to talk to Jamila Smith. Smith wanted to and chose to go with Trooper Beidelschies and speak with him about the pills. She provided him with [what] can only be called a written confession. That would be State's Exhibit 6." (Trial Tr. 752-53) Again, it was the trooper's actions and Smith's actions that were being discussed. While we acknowledge that by reading between the lines, it is possible to infer that Brooks did not agree to speak with the trooper, the main thrust of the comment was to explain how the trooper conducted his investigation. There was no mention as to what Brooks did or did not do, and there was no implication that any post-*Miranda* silence should be used as substantive evidence of guilt.

{¶81} These two statements were so far remotely connected to Brooks' exercise of his Fifth Amendment rights that it is doubtful that they could even be considered as *any* kind of error – and they certainly did not rise to the level of plain error. There was no mention of Brooks' refusal to speak with the officers or his decision to remain silent. At most, it could potentially be implied that he did not volunteer to make a statement at the time when Smith decided she would talk with the trooper. *If* there was any error in the prosecutor's closing remarks, it was harmless error. *See Treesh.*

{¶82} In the second part of this assignment of error, Brooks asserts that the prosecutor improperly used his co-defendant's statements as substantive evidence of Brooks' guilt. We have discussed this matter thoroughly above in our response to Brooks' fourth assignment of error. Any error involving this was an invited error and was waived by Brooks. Furthermore, as we found, there was more than sufficient evidence to find Brooks guilty of possession of drugs without any reference to Smith's statements.

{¶83} We do not find any prosecutorial misconduct that would have prejudicially affected the outcome of the trial. Brooks' sixth assignment of error is overruled.

*Third Assignment of Error – Attorney Conflict*

{¶84} Brooks claims that he was denied his Sixth Amendment guarantee of assistance of counsel because of the existence of an actual conflict of interest arising from defense counsel's simultaneous representation of both Brooks and his co-defendant, Smith, in a joint jury trial. Brooks contends that the dual representation prevented his counsel from taking the necessary steps to insure that Smith's confession was not admitted and that his interests would have been better served by having a separate trial wherein the statement would not have been admissible. Therefore, he contends that his counsel's conflicting loyalties had an adverse effect on her representation of Brooks and a new trial is warranted.

{¶85} The Sixth Amendment right to the effective assistance of counsel secures to a criminal defendant both the right to competent representation and the right to representation that is free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271 (1981); *Glasser v. United States*, 315 U.S. 60, 70 (1942). Courts also have an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988).

{¶86} A possibility of a conflict exists if the "interests of the defendants may diverge at some point so as to place the attorney under inconsistent duties." *State v. Dillon*, 74 Ohio St.3d 166, 1995-Ohio-169, quoting *Cuyler v. Sullivan*, 446 U.S. at 356 (1980), fn. 3. An actual conflict of interest exists if, "'during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action.'" (Emphasis added.) *Id*. at 169, quoting *Cuyler*. *Accord, State v. Gillard*, 78 Ohio St.3d 548, 552, 1997-Ohio-183. The Ohio Supreme Court has held that "a lawyer represents conflicting interests when, on behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." *State v. Manross*, 40 Ohio St.3d 180, 182 (1988); *Gillard*.

{¶87} An "actual conflict of interest," for purposes of the Sixth Amendment, is "a conflict of interest that adversely affects counsel's

performance." *Mickens v. Taylor*, 535 U.S. 162, 172, (2002), fn. 5; *State v. Gillard*, 78 Ohio St.3d at 552. Thus, to prove an "actual conflict of interest," the defendant must show that his counsel "actively represented conflicting interests," and that the conflict "actually affected the adequacy of his representation." *Id.*, quoting *Cuyler v. Sullivan*, 446 U.S. at 349–350. In order to show such a conflict, a defendant must "'point to specific instances in the record to suggest an actual conflict or impairment of [his] interests.'" *United States v. Hall*, 200 F.3d 962, 965–66 (6th Cir.2000) (quoting *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir.1987) (internal quotation omitted)); accord *Riggs v. United States*, 209 F.3d 828, 831–32 (6th Cir.2000). An "adverse effect" is established where the defendant points to "some plausible alternative defense strategy or tactic [that] could have been pursued, but was not because of the actual conflict impairing counsel's performance." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir.2000) (internal quotation omitted).

{¶88} This Court has recognized the trial court's duty to conduct an inquiry into a possible conflict of interest to determine whether a defendant would receive the right to conflict free counsel guaranteed him by the Sixth Amendment to the United States Constitution. *State v. Johnson*, 185 Ohio App.3d 654, 2010-Ohio-315, ¶¶ 3-4 (3d Dist.), citing to *Gillard*. See also *State v. McDuffie*, 3d Dist. No. 9–2000–92, 2001 WL 542114 (May 23, 2001); *State v. Myles*, 3d Dist. No. 9–

2000–93, 2001 WL 542115 (May 23, 2001). However, we have found that "[i]n the absence of special circumstances, it seems reasonable for the trial court to assume that multiple representation entails no conflict or that the lawyer and his clients knowingly accepted such risk of conflict as may be inherent in such a representation." *State v. Bradley*, 3d Dist. No. 14-08-27, 2008-Ohio-6071, ¶ 13, citing *Cuyler*. Requiring or permitting a single attorney to represent co-defendants "is not *per se* violative of constitutional guarantees of effective assistance of counsel." *Holloway v. Arkansas*, 435 U.S. 475, 482-483 (1978). *Accord Wheat*, 486 U.S. 159-160. "The mere representation by one lawyer of two defendants charged with the same offenses does not of itself constitute a conflict of interest; whether a conflict exists must be determined by the facts of each case." *Columbus Bar Assn. v. Ross*, 107 Ohio St.3d 354, 359, 2006-Ohio-5, ¶ 26. In some cases multiple defendants can appropriately be represented by one attorney, and it has been observed that "in some cases, certain advantages might accrue from joint representation." *Holloway v. Arkansas*, 435 U.S. at 482-483. "Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack." *Id.*, quoting *Glasser v. United States*, 315 U.S. 60, 92 (1942) (J. Frankfurter, dissenting).

{¶89} Another element of the Sixth Amendment right to counsel is "the right of a defendant who does not require appointed counsel to choose who will

represent him." *See U.S. v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). "[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire * * *." *Id.*, quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624–625 (1989). In *Gonzalez-Lopez*, the United States Supreme Court held that a trial court's erroneous deprivation of the right to counsel of choice unquestionably qualifies as a structural error, requiring reversal.[9] *Id.* at 150.

{¶90} Here, Brooks and his co-defendant chose to be represented by the same attorney two times -- first, when they retained Mr. Murray, and then again, when they replaced him with Ms. Hickey. Ms. Hickey represented that the Defendants had signed waivers of any conflict for Mr. Murray and for her, and that she had explained to the Defendants in detail about the dangers of dual representation. In the presence of Brooks and his co-defendant, Ms. Hickey emphatically assured the trial court that Brooks' waiver of any conflict and his decision to have a joint trial with joint representation was made knowingly and voluntarily. (*See* 1/3/11 Hrg. Tr. 4-6)

---

[9]The Supreme Court made it clear that its decision was not modifying its previous holdings that limit the right to counsel of choice and recognize the authority of trial courts to establish criteria for admitting lawyers to argue before them. *Gonzales-Lopez* at 151. The right to counsel of choice does not extend to defendants who require counsel to be appointed for them; nor may a defendant insist on representation by a person who is not a member of the bar; or demand that a court honor his waiver of conflict-free representation. *Id.* at 152. The Supreme Court recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar. *Id.* The Supreme Court also recognized the trial court's "'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" *Id.*, quoting *Wheat, supra*, at 160.

**{¶91}** The trial court explained to counsel and the Defendants how this dual representation and joint trial would limit the type of defense available. However, Ms. Hickey assured the trial court that they were aware of this, and that the joint representation would not be detrimental to their chosen trial strategy.

> The Court: That would severely limit your opportunity to present any antagonistic defenses.
>
> Ms. Hickey: That's correct.
>
> The Court: Because possession is going to be the focus of this, correct?
>
> Ms. Hickey: Yes. Although certainly to the extent that a driver of a car can possess drugs or anything in the car without the passenger's knowledge. That still leaves that defense available. Something to argue to the jury. *But there is no other – there's nothing that we've ever viewed as antagonistic defenses, and we did discuss that as well.*

(Emphasis added.) (1/3/11 Hrg. Tr. 6-7). The trial court then personally addressed Brooks and Smith individually, and they verbally affirmed that they had "thoroughly discussed this issue with Ms. Hickey and the other perils of a joint trial" and that they wished to go forward as represented. *Id.* at 8. The trial court had no reason not to believe that this was the knowing choice based upon the representations of the Defendants' attorney and their agreement. In *Holloway v. Arkansas*, the United States Supreme Court acknowledged that an "attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will

probably develop in the course of a trial." 435 U.S. at 486. Here, the trial court was repeatedly assured that the parties did not have opposing interests at trial.

**{¶92}** Furthermore, on the record before us, we find no evidence that trial counsel's basic strategic decisions were influenced by the interests of Smith to the detriment of Brooks. *See State v. Tucker*, 1st Dist. No. C-020821, 2003-Ohio-6056, ¶ 30. In fact, it would appear that Brooks benefitted from the joint representation, to the detriment of Smith. If Smith had been represented by a different attorney, it is highly likely that an independent attorney would have advised her to accept the plea bargain that was offered to her and testify against Brooks, in exchange for a recommendation of a sentence involving only community service. *See State v. Smith*, 3d Dist. No. 5-11-10, 2012-Ohio-5020. The record contains no indication that Brooks was offered any plea agreement that would have created a conflict due to joint representation. The prosecutor stated that, "As to Mr. Brooks, the only negotiations we have is that the State would remain silent if he pled guilty to the charge as it is set forth." (3/25/10 Suppression Hrg. Tr. 9-10)

**{¶93}** It was clear that Brooks, Smith and Ms. Hickey had knowingly and deliberately chosen a joint strategy that did not involve an antagonistic defense and that relied upon discrediting Smith's statement to the police and the results of the police search. In hindsight, after that trial strategy did not succeed, Brooks

now wishes to have the opportunity to try a different strategy, complaining that he was prejudiced because the trial court allowed him to proceed with his chosen counsel and trial strategy.

{¶94} If the trial court would have decided otherwise and not permitted Ms. Hickey to represent Brooks, we would probably still be reviewing this matter on appeal, but instead, Brooks would be complaining that he was convicted because he was erroneously denied his counsel of choice. *See Gonzalez-Lopez*, *supra*. The United States Supreme Court has acknowledged the dilemma involved in balancing the sometimes conflicting Sixth Amendment rights.

> [T]rial courts confronted with multiple representations face the prospect of being "whip-sawed" by assertions of error no matter which way they rule. If a [trial] court agrees to the multiple representation, and the advocacy of counsel is thereafter impaired as a result, the defendant may well claim that he did not receive effective assistance. * * * On the other hand, a [trial] court's refusal to accede to the multiple representation may result in a challenge such as petitioner's in this case.

(Citations omitted). *Wheat v. U.S.*, 486 U.S. at 161.

{¶95} Under the facts of this case, and as they apply to Brooks' defense, we do not find evidence in the record that trial counsel actively represented conflicting interests pursuant to the manner in which she chose to defend Brooks, nor was there evidence that the conflict actually affected the adequacy of Brooks' representation. *See Mickens*, 535 U.S. at 172. We do believe that the better course of action would have been for Brooks to have retained separate counsel

and have a separate trial. However, those considerations of fairness must be weighed against Brooks' right to retain his chosen counsel, and his voluntary waiver of conflict-free representation. *See Gonzalez-Lopez*, 548 U.S. at 152. *See also Holloway*, 435 U.S. at 482-483, fn. 5 (acknowledging that United States Supreme Court has confirmed that a defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests.)

{¶96} A trial court has "wide latitude" in determining whether an actual or potential conflict exists. *State v. Keenan*, 81 Ohio St.3d 133, 137, 1998-Ohio-459; *Gonzalez-Lopez*, 548 U.S. at 152 (recognizing "a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness). We do not find that the trial court erred when it permitted Brooks to waive any potential conflict and retain the counsel of his choice, after ascertaining that such dual representation would not be detrimental to Brooks under the chosen trial strategy. Therefore, Brooks' third assignment of error is overruled.

*Seventh Assignment of Error – Denial of Motion for New Trial*

{¶97} Brooks' complaints in this assignment of error concern the decision of the trial court to allow Ms. Hickey to represent the Defendants pro hac vice and to allow Mr. Murray to withdraw as counsel. Brooks asserts that Ms. Hickey's

admission to practice in Ohio was improper and did not comply with the requirement that she affiliate with local counsel, i.e., Mr. Murray. He also asserts that the "trial court's *ex parte* procedure for removing local counsel deprived him of his right to an Ohio-licensed attorney and his right to be present at a critical stage." (Appellant's Brief, p. 26) Therefore, given these errors, Brooks argues that the trial court should have granted his Civ.R. 33(A) motion for a new trial, claiming that his Sixth Amendment right to counsel was violated because Ms. Hickey's pro hac vice admission was invalid, and thus she was not licensed to practice law in the State of Ohio at the time of the trial. Brooks claims that the denial of his right to an attorney who meets the qualifications for admission is prejudicial and is grounds for a mistrial.

{¶98} Attorneys admitted to practice in other states but not admitted to practice in Ohio do not have a right to practice in courts in Ohio. *Royal Indem. Co. v. J.C. Penney Co.*, 27 Ohio St.3d 31, 33 (1986). They may, nevertheless, be permitted to appear in an action by the court pro hac vice, meaning "for this occasion or particular purpose." A trial court has wide discretion in the exercise of its duty to supervise members of the bar appearing before it. *Id.* at 35; *Schmidt v. Krikorian*, 12th Dist. No. CA2011–05–035, 2012-Ohio-683, ¶ 9. Consequently, a party challenging the trial court's denial of a motion to admit an out-of-state attorney pro hac vice must demonstrate that the trial court abused its discretion.

*Id.* The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶99} Since an attorney's admission pro hac vice is limited in duration, the requirements for admission are less stringent than those for permanent admission to the state bar. *See* Gov.Bar R. I (general admission to the practice of law); *cf.* Gov.Bar R. XII (pro hac vice admission). *Davis v. Marcotte*, 193 Ohio App.3d 102, 2011-Ohio-1189, ¶ 8 (10th Dist.). In fact, Gov.Bar R. XII, which sets forth the procedure and requirements governing pro hac vice admission before trial courts and other tribunals throughout the State of Ohio, did not become effective until January 1, 2011. The new rule is only applicable to motions for permission to appear pro hac vice filed after January 1, 2011. At the time Ms. Hickey filed her motion and was granted pro hac vice admission by the trial court in 2010, there were no state-wide rules governing the pro hac vice admission of attorneys wishing to practice before a court of common pleas. That decision was left to the trial court and any local rules that may have been applicable. "The right to confer or revoke pro hac vice status is 'part of the court's inherent power to regulate the practice before it and protect the integrity of its proceedings.'" *LMC Weight Loss, Inc. v. Victory Mgt., Inc.*, 182 Ohio App.3d 228, 2009-Ohio-2287, ¶ 5 (6th Dist.), quoting *Royal Indemnity Co.*, 27 Ohio St. 3d at 33-34. "The decision of whether

to permit representation by out-of-state counsel in an Ohio court is a matter within the discretion of the trial court." *Royal Indemnity Co.* at 33.

{¶100} The Sixth District Court of Appeals addressed the balancing act between the litigant's interest in obtaining counsel of his own choice and the state's interest in regulating attorneys seeking to be admitted to practice pro hac vice.

> "In this period of greater mobility among members of the bar and the public, and the corresponding growth in interstate business, a court should reluctantly deny an application to appear pro hac vice. *A litigant's request to be represented by counsel of his choice, when freely made, should be respected by the court, unless some legitimate state interest is thwarted by admission of the out-of-state attorney*."

(Emphasis added.) *State v. Roble*, 6th Dist. No. L-04-1373, 2006-Ohio-328, ¶ 13, quoting *Enquire Printing and Pub. Co., Inc. v. O'Reilly*, 193 Conn. 370, 375, 477 A.2d 648 (1984).

{¶101} In an effort to accommodate Brooks' right to be represented by the counsel of his choice, the trial court admitted Ms. Hickey to practice pro hac vice. The trial court found that Ms. Hickey was a duly licensed attorney in the State of Michigan, in good standing, and presented herself as a thoroughly qualified and experienced counsel. She had been an attorney for 27 years, had participated in over 200 jury trials, and had represented Brooks in previous matters. The trial court, explained that "[h]aving determined that Ms. Hickey was competent [and]

guided by a strong sense of justice, [it] endeavored to provide [Brooks] with counsel of his own choosing." (Mar. 22, 2011 Decision, p. 10) The trial court also stated that it had "made numerous observations of Ms. Hickey and found her to be a zealous and competent advocate. From any objective perspective, it cannot be said that she provided ineffective assistance of counsel to [Brooks]." (*Id.* at p. 8)

{¶102} We do not find that the trial court's decision to admit Ms. Hickey was an abuse of its discretion. It complied with the rules of the Hancock County Court of Common Pleas that were in effect at the time she was admitted, and therefore, she was properly qualified to represent Brooks at the time of his trial. Although Ms. Hickey represented that she would remain affiliated with local counsel in her motion, this was not a requirement under the Rules for the Governance of the Bar that were in effect at the time of her pro hac vice admission, nor was it a requirement of the local rules. The trial court was aware that Mr. Murray had resigned, and, based upon Ms. Hickey's qualifications, did not feel it was necessary to include the requirement that another local counsel be retained by the Defendants. Therefore, there was no basis for Brooks' motion for a new trial due to Ms. Hickey not being licensed to practice law in Ohio.

{¶103} Brooks also claims that Ms. Hickey's representation was a violation of Rule 5.5 of the Rules of Professional Conduct requiring affiliation with local

counsel under specified circumstances. However, it is uncertain if that rule is applicable to a situation such as this where the attorney was admitted pro hac vice by the trial court. And, in any case, a criminal defense counsel's "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel*." State v. Leonard*, 157 Ohio App.3d 653, 2004-Ohio-3323 (1st Dist.) ¶ 32, quoting *Nix v. Whiteside*, 475 U.S. 157, 1652 (1986).

{¶104} Furthermore, Crim.R. 33 only allows a new trial when an irregularity "prevented [the movant] from having a fair trial." Brooks has not presented any evidence that he was denied a fair trial. The record does not support the contention that he was harmed by not having local counsel. Many of the issues involved in a criminal trial are based upon United States Constitutional rights and decisions of the United States Supreme Court, which apply equally in all fifty states, regardless as to which state a criminal attorney may hold a license to practice. Ms. Hickey had worked as an assistant prosecutor for 12 years in Wayne County, Michigan, and then she had done criminal defense work exclusively since 1997 or 1998; she was knowledgeable in the applicable law. (5/23/11 Sent. Hrg. 39) Any unfamiliarity that she might have had with "local" Hancock County customs or procedures would have also been applicable if Brooks had hired an

Ohio-licensed attorney from Cleveland, Columbus or Cincinnati, and would not have been a cause to grant a mistrial.

{¶105} Brooks' also claims that he was denied the right to be present when his first attorney, Mr. Murray, was allowed to resign from the case. However, the record clearly shows that he knew that Mr. Murray was going to leave, and that it was Brooks' own decision to replace Mr. Murray with Ms. Hickey. Mr. Murray's motion for withdrawal of counsel stated that "Defendant Brooks has employed newly retained counsel, Mary S. Hickey, Esq., as his defense attorney, to replace undersigned movant counsel Murray." (Sept. 28, 2011 Motion) There was no "proceeding" at which the trial court "removed" Mr. Murray. It was not the trial court's decision to "remove" local counsel; it merely granted Mr. Murray's motion, which represented that it was made at the request of the Defendants. Attorney Hickey discussed on the record that she had multiple conversations with the Defendants concerning trial strategy and potential issues. Brooks cannot claim ignorance of who he had hired to represent him when he took such an active role in his defense. The following exchange took place at the sentencing hearing:

> The Court: Ms. Hickey, * * * you applied to represent [the Defendants] and you showed up in this Court and you applied to represent them and you represented in your motion that they sought your assistance in this case. Is that true?
>
> Ms. Hickey: That's what I represented in my motion, yes.
>
> * * *

The court: I granted your request to apply, and then is it your recollection it was thereafter that Mr. Murray moved to withdraw?

Ms. Hickey: Yes. After.

The Court: Did your clients know that Mr. Murray was withdrawing?

* * *

Ms. Hickey: Yes.

(5/23/11 Sent. Hrg. Tr. 34-38) The record is clear that Brooks was present at every hearing and every stage of the proceeding; that it was his choice that Mr. Murray no longer represent him; and, that he retained Ms. Hickey and sought out her representation. He cannot now claim ignorance of the proceedings that he caused to occur.

{¶106} Any error involved in this matter is invited error and, as such, cannot be grounds for appeal. Furthermore, if Brooks had believed it was imperative to have local counsel in addition to Ms. Hickey, then *he* should have replaced Mr. Murray after he resigned and retained another local counsel. *See Hai v. Flower Hosp.*, 6th Dist. No. L-07-1423, 2008-Ohio-5295 (case was dismissed when plaintiff failed to follow court's order to retain another local counsel to assist their out-of-state attorney, after the first local counsel resigned.) The trial court's judgment entry permitting Ms. Hickey to appear as counsel for the Defendants did not contain any qualification that she be required to work with local counsel.

-63-

{¶107} In a well-researched and well-reasoned decision, the trial court provided a detailed analysis of all of the issues raised by Brooks, and explained why his assertions did not provide any grounds that would entitle him to a new trial. (See Mar. 22, 2011 Decision) We agree with the trial court's analysis and conclusions, and do not find that the trial court abused its discretion in its decisions pertaining to Ms. Hickey's pro hac vice admission. The trial court did everything in its powers to accommodate Brooks' choice of counsel, including allowing Ms. Brooks to replace his previously retained counsel only two weeks before the scheduled trial date, causing further delay in this case. Brooks' seventh assignment of error is overruled.

*Eighth Assignment of Error – Ineffective Assistance of Counsel*

{¶108} In his final assignment of error, Brooks contends that he was denied his right to effective counsel pursuant to the Sixth Amendment, and raises seven areas in which he asserts that Ms. Hickey was ineffective. Those claimed instances of ineffectiveness are: (1) failure to withdraw from dual representation; (2) failure to know Ohio law/associate with an Ohio attorney/advise client properly; (3) failure to oppose consolidation of Brooks' trial with his co-defendant; (4) failure to request redaction with limiting instruction pertinent to Smith's confession; (5) failure to object to prosecutorial misconduct; (6) failure to

object to damaging testimony and eliciting damaging testimony on cross-examination; and, (7) failure to strike a juror for cause.

{¶109} To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation; and (2) prejudice -- a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–688 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraphs two and three of the syllabus. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that strategy and tactical decisions exercised by defense counsel are well within the range of professionally reasonable judgment and need not be analyzed by a reviewing court. *State v. Robinson*, 108 Ohio App.3d 428 (3d Dist.1996).

{¶110} The majority of Brooks' allegations concerning instances of ineffectiveness of counsel have already been addressed in previous assignments of error, and we have concluded that either there was no error on the part of counsel or there was no evidence that counsel's actions were prejudicial to Brooks to the extent that the outcome of the trial would have been different. Therefore, we shall just briefly summarize our findings pertinent to these claimed errors.

{¶111} First, Brooks claims that Ms. Hickey erred in failing to withdraw from dual representation. We did not find evidence in the record that trial counsel actively represented conflicting interests pursuant to the manner in which she chose to defend Brooks, nor was there evidence that the conflict actually affected the adequacy of Brooks' representation. Brooks did have a right to retain the counsel of his own choosing, and the record demonstrated that his waiver of conflict-free counsel was made knowingly and voluntarily. Next, Brooks complains about counsel's failure to know Ohio law, to associate with an Ohio attorney, and to properly advise him. Again, in our analysis of these issues pertinent to the seventh assignment of error, we did not find any prejudicial error.

{¶112} Brooks also cites as error his counsel's failure to oppose consolidation of Brooks' trial with his co-defendant and her failure to request redaction with limiting instruction pertinent to Smith's confession. In the fourth assignment of error, we thoroughly examined these two issues and found that they constituted invited error, as Brooks was well aware that this was part of the defense's trial strategy and he had waived any error associated with these issues. And, even if his waiver was not knowingly and intelligently provided, we still did not find any prejudicial error that would have changed the outcome of the trial.

{¶113} In his fifth and sixth complaints against his retained counsel, Brooks alleges that she failed to object to prosecutorial misconduct and to

damaging testimony by the State's witnesses. He further complains that Ms. Hickey even elicited damaging testimony on cross-examination. We addressed these issues in our responses to the fifth and sixth assignments of error, and our review of the record did not find any conduct constituting a reversible error in this regard. "The scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006–Ohio–2815, ¶ 101. The failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel and may be justified as a tactical decision. *State v. Gumm*, 73 Ohio St.3d 413, 428, 1995-Ohio-24.

{¶114} Finally, Brooks' seventh claim of ineffective assistance of counsel maintains that Ms. Hickey was ineffective for failing to strike a juror. Juror J.H. was the first cousin of the trial prosecutor's father, and she had a cousin who was a canine deputy working for the sheriff's office (but he was not Deputy Smith and was not involved in this case). Brooks asserts that this juror was biased because of these family relationships and that Ms. Hickey should have sought to have this juror removed.

{¶115} Both the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution provide that a criminal defendant is entitled to a speedy and public trial "by an impartial jury." The purpose of voir

dire is to examine prospective jurors to determine whether they have both the statutory qualification of a juror and are free from bias or prejudice. *Pavilonis v. Valentine*, 120 Ohio St. 154 (1929), at paragraph one of the syllabus.

{¶116} Pursuant to R.C. 2313.42, a prospective juror may be challenged for cause if he "discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." R.C. 2313.42(J). When a juror's impartiality is at issue, the relevant question is "did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Dennis v. Mitchell* (C.A.6, 2003), 354 F.3d 511, 520, quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984).

{¶117} Although it is true that Juror J.H. was a cousin of a sheriff's deputy, she stated rarely spoke with him about his work and did not even know that he had a certified canine. (Trial Tr. 118) In addition, although she was a distant relative of the prosecutor, this juror was specifically questioned concerning the influence of her relationships and indicated that she could be fair and impartial, going so far as to say that she would have no problem rendering a not guilty verdict in the matter. (*Id.* 121) Attorney Hickey questioned this juror extensively, and the juror responded that she would follow the judge's instructions and render an impartial verdict. (*Id.* 123-26) Although Ms. Hickey did not use all of her peremptory

challenges, before deciding to waive, she twice left to discuss the matter with Defendants, and, after discussing the matter with them, stated "I am satisfied with the process on behalf of both Ms. Smith and Mr. Brooks." (Trial Tr. 142)

{¶118} The Ohio Supreme Court has held that the use of peremptory challenges is inherently subjective and intuitive and, as a result, an appellate record will rarely reveal reversible incompetence in this process. *State v. Mundt*, 115 Ohio St.3d 22, 2007–Ohio–4836, ¶ 83. Furthermore, decisions on the exercise of peremptory challenges are a part of trial strategy, and trial counsel, who observe the jurors firsthand, are in a much better position to determine whether a prospective juror should be peremptorily challenged. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶ 99.

{¶119} To be successful under *Strickland,* an appellant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. 668, 694. When the record is examined in its entirety, it is clear that no bias existed and the juror indicated she would remain impartial. Therefore, there is no evidence that Ms. Hickey was ineffective for failing to challenge the juror. And, it is unlikely that the trial court would have granted a motion to strike the juror for cause, so counsel was not ineffective for failing to make such a motion.

{¶120} Our review of this assignment of error demonstrates that most of the issues raised by Brooks did not amount to any error on the part of his counsel. And, even where errors existed, we do not find that they were prejudicial because they would not have affected the outcome of the trial. Nor do we find that the "cumulative effect" of the trial counsel's errors was sufficient to undermine our confidence in the outcome of the proceedings. *See State v. Dobson*, 8th Dist. No. 92669, 2010-Ohio-2339, ¶ 47. Therefore, the eighth assignment of error is overruled.

{¶121} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. concurs.**

**/jlr**

**ROGERS, J. Dissents.**

{¶122} I respectfully dissent from the result reached by the majority in this case. In the companion case of *State v. Smith*, 3d Dist. No. 5-11-10, 2012-Ohio-5020, this court unanimously found that a conflict of interest existed and reversed the conviction. It is counter-intuitive to suggest that counsel could represent one

of the two Defendants without a conflict of interest when a clear conflict of interest exists with the other.

{¶123} In his fourth assignment of error, Brooks argues that consolidation of his trial with that of Smith was plain error. The majority cites to *State v. Kuhn*, 9th Dist. No. 05CA008859, 2006-Ohio-4416, to support their theory that this was invited error. However, while the two defendants in *Kuhn* (husband and wife) agreed to joint trials, they were represented by separate counsel, which is a significant distinction from the case at bar.

{¶124} The majority further relies on invited error in response to Brooks' complaint that the State used his co-Defendant's statement as substantive evidence of Brooks' guilt. But without a joint trial Smith's statement would not have been admitted at Brooks' trial. The admission of Smith's statement had the effect of diminishing her culpability as compared to Brooks and bolstering the credibility of her defense that she was an innocent passenger. This strategy is inconsistent with any defense theory for Brooks, and it demonstrates a clear conflict of interest as he alleged in his third assignment of error.

{¶125} I further note the following concerns:

1.    Although counsel verbally represented to the trial court that the Defendants had signed written waivers of any conflict with prior counsel, Mr. Murray, there is no written waiver of joint representation in the record;

2.    Trial counsel was not admitted to practice in the State of Ohio;

3. Counsel was admitted pro hac vice[10] in this case on her motion, which assured the trial court that she would be assisted by Ohio counsel;

4. Prior Ohio counsel, Mr. Murray, was granted leave to withdraw and was not replaced; and

5. The trial court's colloquies on the *Bruton* issue of joint trial and as to the issue of joint representation were primarily with trial counsel and only featured a superficial inquiry of the defendants.

{¶126} Finally, the majority states that the trial court "personally addressed Brooks and Smith individually, and they affirmed they had 'thoroughly discussed this issue [of joint representation] with Ms. Hickey'" and the "trial court had no reason not to believe that this was the knowing choice based on the representations of the Defendants' attorney and their agreement." *Ante* at ¶ 91. Yet in the *Smith* opinion the inquiry of the Defendants was described as "brief and perfunctory." *Ante* at ¶ 35. I find the difference in description interesting, but unconvincing.

{¶127} I would sustain Brooks' third and fourth assignments of error and decline to consider the other assignments as being moot.

---

[10] Although Gov.Bar R. XII Rule on pro hac vice admission (effective Jan. 1, 2011) was not in effect at the time the trial court ruled on counsel's motion, it became effective prior to the date of trial, and there was no compliance with that Rule. I further note that counsel's joint representation of Brooks and Smith does not appear to be compliant with Rule 1.7 of the Rules of Professional Conduct.